We have a pretty full morning, five cases for argument. Ordinarily, Judge Matheson would be presiding today, but instead we see his face on a screen in Salt Lake City. We've done this before and we think it will work well today. The first case for argument is Scalia v. Paragon Contractors, docket 19-40-97. And let me just confirm that Ms. Mohan is on the phone and able to hear me. Yes, Your Honor. Okay. Thank you. All right. In that event, Mr. Sutherland, we are ready when you're ready to begin. Thank you, Your Honor, and I will attempt to reserve five minutes for rebuttal. May it please the Court, I am Rick Sutherland here on behalf of Defendants, Paragon Contractors, and Brian Jessup. I would like at the outset to point out that there are two additional cases with respect to the standard review that are not cited in the briefs that may be helpful to the Court. The first is from the First Circuit in Cuello-Suarez v. Puerto Rico Electric Power Authority, reported at 988-F2-275, First Circuit 1993, which also confirms that the standard review is in denovo. I'm going to ask you to pause there and ask Judge Matheson and opposing counsel, are you able to hear? Because it's kind of breaking in and out off the microphone here. I'm able to hear, yes. Thank you. All right. Sorry for the interruption. Please continue. And we did stop the clock. Thank you, Your Honor. And the second is a Tenth Circuit case. This case does not exactly discuss the distinction between the two standards of review, but it does acknowledge that the appellant in that case argued in her appeal that the trial court committed an error of law in applying the wrong standard to determine whether she had presented a prima facie case. And the court said, quote, thus, the clearly erroneous standard of review is inapplicable. And that case is Crawford v. Northeastern Oklahoma State University, reported at 713-F2-586, 1983 decision. Mr. Sutherland? Yes, Your Honor. Yes. Just to be clear on your position, with respect to the determination under the Mount Clemens test of a just and reasonable inference, is it your position that we review that inference under de novo review and not for clear error? That is correct, Your Honor. And I think these cases, the two discussed in the brief, provide a very thorough analysis of why that's the appropriate standard. And I just pointed out two others that confirm that same approach. Given the fact that your client did not keep any records at all, how can we look at inferences and give any credence at all to your argument? Well, the inferences that we are to look at, Your Honor, are those that arise from the evidence presented by the plaintiff before the trial court. Well, where do you say the evidence is lacking? Well, the evidence is lacking in many, many respects, Your Honor. Well, tell me where. I mean, they've got 112 claims, if you will, and they've filled in the gaps based on the materials that were in front of them, what the court did, the secretary did. And where did they go wrong? The Tenth Circuit has dealt with the Mount Clemens standard many times. You feel okay? I'm sorry? I said you don't have any cold or any virus or anything do you right now? No, I'm sorry, Your Honor. Just clearing my throat. Okay. We're a little bit scary today. Yeah, no doubt, no doubt. The Tenth Circuit has dealt with the application of Mount Clemens many times. In every single case that's reported, they're cited in the briefs, they're cited in the district court's opinion. In every case, there was direct evidence from the claimants, from the employees. We have direct evidence here, too. No, we don't, Your Honor. We do. We have a number of claims filed, 104 claims from eligible children. We've got 49 claimants stating that they worked on the ranch in 2013. And you have put forward no evidence whatsoever. No direct evidence, Your Honor. Those claims forms that the Department of Labor relied on to prepare their summary were nothing more than fill-in-the-blanks on a form that was prepared by the department. There were no interviews. No direct evidence. Do you just mean the employees have to come in and be deposed, or what? That's what happened in every single case. Right. But if you make that the only standard, and we're talking about children who were working years ago, that's a pretty difficult standard to meet, isn't it? Well, Your Honor, at least they should have interviewed them. Department of Labor's own policy and practice in Dwight's reconstruction cases, as is cited in the briefs, is to interview— Did you interview them? Did you take their depositions or anything? I wasn't allowed to, Your Honor. They never disclosed the identity. There was no opportunity for discovery, excepting an informal meeting conference that took place to review the spreadsheet. So I've pointed out in the briefs all of the flaws associated with the summary that the Department of Labor prepared, and there are numerous ones. The assumptions that were built in and the conclusions that were reached were based on items that were not substantiated in the record. For example? For example, the assumption that where there was no evidence provided of hours worked or days worked or number of weeks worked— I'm sorry. You have to stay with the microphone. I'm sorry, Your Honor. When the forms, the data requests of the forms were incomplete, the Department of Labor built in assumptions, and those assumptions he labeled as a universal average. And in calculating that universal average, he did not even use all of the claims forms. He used only a portion of them, and this is all in the record. He used only a portion of them and calculated not the average, but the highest number that he could justify from those forms. Well, he used the mode. That's correct, Your Honor. That's correct. And that's the most frequent value in a set of data, isn't it? He used the mode only if you consider only the forms that reported the number of hours. But if you consider all of the forms, even those that didn't have the information or reported other hours, then he didn't even use the mode. So he only used the mode of a reduced set. So you say he should have had zeros in there? Well, certainly, if you're going to calculate, you should consider... Well, if you're going to make an inference, and if you have ten people that worked six hours and two people that didn't fill in the blank, why can't you infer that they worked the same number of hours as the others? They're all out there together picking pecans. See, that's the problem we ran into, Your Honor, is he certainly should have asked those people. He could have called them. He could have reached out to them. He had their contact information, but he didn't. He simply just made these assumptions. That's the ultimate in presumptive, speculative assessment and calculation of wages. The law doesn't allow that to occur, even in a model such as this. What degree of precision are you demanding here? In other words, what would satisfy you as far as the government's proof? They certainly, as a minimum, should have interviewed the individuals and should have gotten some statements from the individuals based on interviews. In an ordinary setting, there would have been depositions available to the defendants. We didn't have that opportunity here. This is an unusual case in the sense that, unlike any other case I've been able to find at least in a Tenth Circuit, this situation has not occurred in a contempt setting with abbreviated proceedings. Mr. Settleman, wasn't there evidence, though, in the contempt proceedings that the children were being told to say that they had not worked at the farm? There was a testimony from one individual whose stepfather indicated to her that if she were asked, she should say she doesn't know anything. Other than that, there was no other testimony along those lines. Only one instance? Yes. And I might mention, too, that – excuse me, go ahead, Your Honor. Well, apart from your point about the need to interview, I'd like to ask you about the statistical step that was taken by Mr. Hunt in terms of attributing days worked and weeks worked. We're back to the use of the mode, but I'm interested in your commenting on whether or why that wasn't a reasonable attribution. So we have 104 forms filled out, 57 of them reported number of days worked per week. So 47 of them didn't have that information. And as I understand it, Mr. Hunt attributed six days per week to those 47, and he did that because a majority of the forms that did report that information did have six days per week. Now, what's wrong with that? A couple of things. First of all, Your Honor, he did not include all 135 forms that were originally submitted. I know. I said it was 104. I'm just talking about why is it wrong for him to use – there were 37 that reported six days a week. Why was it wrong for him to give six days per week to the 47 that didn't report? Because notably, Your Honor, there were a couple of instances where individuals did submit their own information. And whenever that occurred, the information submitted did not support his universal average. There were five times that individuals called in directly rather than use the claims forms. In none of those instances did those individuals ever come close to substantiating the number of days that Mr. Hunt used as his universal average. Those individuals who submitted their own statements in addition to the forms also indicated far fewer days than Mr. Hunt utilized. He disregarded all that. Are we talking about people who are within this group of 47? Yes, Your Honor. Okay. By the way, did you present any expert testimony on statistical analysis at the hearing? No, we did not, Your Honor. The hearing was set to review Mr. Hunt's spreadsheet. But if you needed to challenge his statistical analysis, didn't you have to have some statistical expertise to do so? Well, I don't think so, Your Honor. This was not a sophisticated statistical analysis. It was simply a calculation of averages. It was what, I'm sorry? Simply a calculation of averages. It's a pure mathematical application of the concept of calculating the average of a set of numbers. There's a number of things I'd like to address, but I'm out of time. I'd like to reserve the rest of the rebuttal. Thank you. So, we are ready to hear from you whenever you're ready. May it please the Court, my name is Erin Mohan, and I'm appearing on behalf of the United States Department of Labor. As we've discussed today, Paragon and Brian Jessup produced no records at all of the hours that hundreds of children worked for them at the Southern Utah Pecan Ranch. They didn't pay the children at all, so unlike in many cases where employers fail to keep adequate time records, there were also no pay stubs here you could use to reconstruct the children's schedules. And, indeed, Paragon and Brian Jessup refused to even name the children Van Lawsley employed. Well, is it correct that you would not let them interview the children? We did not disclose the names of the children were never entered into the records. Claim forms went in with the names redacted. Well, that sort of deprives the opportunity of any kind of investigation at all, doesn't it? Well, I believe, Your Honor, the idea was that there was a pretty extensive back-and-forth process between the Department and Paragon. After the Department initially proposed, evaluated the claims, and initially proposed damages, then the Department and Paragon went back and forth. There was some limited discovery as to how the damages were calculated. And Paragon also had access to the children and parents who testified at the underlying contempt proceeding. And how many children testified in the underlying contempt proceeding? I believe it was six, one child, and then five siblings, and then two parents testified. And their testimony was generally, in their testimony, it was generally consistent with what you saw in the claims forms, showing that it wasn't unusual at all for children to be working Monday through Saturday, and also describing the harvest season as beginning in November. And then there was other evidence showing that it ended at the end of January, the next year. Thank you. So, the way that the District Court addressed these challenges was by establishing the claims process in the order on sanctions, which this Court already has upheld in relevant part. Ordering the Department to estimate the wages owed to the children based on the information received from that process, the Department did so, and the District Court correctly found that it could reasonably infer the damages the Secretary proposed based on that evidence. With respect to the standard of review in this case, the standard of review here is innovo as to questions of law, and clearly erroneous standard of review as to questions of fact. Most of the issues here are fact issues. Certainly all of the issues raised by Paragon in its opening brief in its statement of fact are factual issues, and those issues are subject to clearly erroneous review. The cases that Paragon has discussed in its reply brief are cases involving anti-discrimination statutes and McDonnell-Douglas burden shifting. They are not Mount Clemens cases. Here the question of whether it was reasonable to infer that children who did not report worked six days per week, 13 weeks per year, that was a question of fact that the District Court determined by weighing the evidence and making credibility determinations. Whether the hours reported by the children reported on their forms were inclusive of travel time, that was also a fact question that the District Court resolved by weighing the evidence, making credibility determinations, and determining in that instance that the children were not reporting travel time on their forms. Was there any objection made to any of the evidence as it was being produced in District Court? There was no evidentiary – well, I'm sorry, let me make sure I understand, Your Honor. In terms of the claims forms themselves, there was no objection as to their admissibility in the District Court. All right. Thank you. So any issue involving admissibility at this point is weighed and not before the court, although we believe they would have surmounted any challenge to that fact. Paragon has made a number of arguments here as to why the claims and the estimates are imprecise. And it's true. The estimates aren't as precise as they would have been had Paragon contemporaneously recorded the hours and days and weeks the children worked. But Paragon didn't produce the records of the hours. To the contrary, it strenuously resisted producing any information that would have helped quantify the hours the children worked in this case. And the central teaching of the Supreme Court's decision in Mount Clemens is that the children should not be punished for this. The representative values that the Department used in this case for not all but some of the children who didn't report either the days per week or weeks per year that they worked were based on large samples of children, much larger samples than in even a typical case where the Department aims for about 10 percent of the employees. And as I mentioned, they were consistent with the evidence and the testimony from the underlying contempt hearing. So it was entirely reasonable for the District Court to infer that the children worked the hours the Department estimated. Paragon and Jessup, for their part— Counselor, could I just get a clarification of your position there? Let's take the weeks per season on the numbers that were used there. Of the—you say that 43 out of 83 claimants reported working 2.5 to 3 months or more per year. I'm not clear on how you get to 13 weeks from there. 2.5 months doesn't equate to 13 weeks. Your Honor, the Department took three—from that range, the Department took three months and then it used a conversion factor to convert the three months into weeks. I'm asking about 2.5 months, not three months. So the range was 2.5 to three months or more. What the official did was to group the claimants into groups with respect to the weeks per year. And then the highest—the group that had the most minors in it was the group that was 2.5 to three months or more per year. There was also, in this case, this particular information was not always reported by the children in weeks. So sometimes you see on the claims forms 10 weeks, 11 weeks, 12 weeks, 13 weeks, 14 weeks. But sometimes what you would see is November through January or more information that indicated a certain number of weeks but did so without using numerals in that way. And so I think that this was sort of a response to making sense of that data there. The 13 weeks concept was also consistent with this idea of the harvest season running from November to January. And in many of the instances where the Department filled in the 13 weeks, you have some other indication that 13 weeks would have been appropriate. For example, the child said they worked all season. Well, is that true? On the weeks per season, 21 of the 104 forms didn't have anything listed. And what ended up being used was 13 weeks based on the fact that 43 of those who filled out the forms said 2.5 to three months. But what that means is that 32 of the 83 forms reported working three weeks or less, and yet the blank forms are all given a 13-week. I'm just not clear on why that is a reasonable attribution. So I want to make sure I understand. I think you had said that 32 worked three weeks or less, but the data doesn't quite bear that out. Eight children said they worked from one to two months per year, 18 said they worked three weeks per year, nine said they worked one to two weeks, and five said they worked up to a week. So much smaller numbers of children were reporting anything below 2.5 months per year. And of the 21 where the children did not specify, where it says on the supplemental appendix 632 that the children didn't specify the weeks they worked, there oftentimes was still some description there that indicated the weeks worked per year. Like I said, they said all season, for example. I think we're going to get bogged down with these numbers, and we don't have a lot of Mr. Hunt took the mode, that is the most frequently given answer, and took that and attributed it to those who didn't give an answer. Now that isn't, and he called that an average. That's not an average. That's a mode. If he'd done an average of what everyone reported, or even a weighted average of what everyone reported, he wouldn't have got a 13-week number for those who didn't report, or a six-day per week number for those who didn't report. So why is that a statistically valid way of imputing a number that was never given in the first place by those children? There isn't anything that says you have to use the arithmetic mean when you're doing a backwage reconstruction. And here... But that doesn't answer the question. The question is whether it is statistically legitimate to impute that number. And all we have is Mr. Hunt at the hearing saying, that's what I did. Is he a trained statistician? I don't know. I don't... He is not a... His role in the department is not. As a statistician, I'm not sure exactly what his training is. He is the... Was a wage and hour investigator, and was promoted to be the district director. But wage and hour investigators regularly do backwage reconstructions. This is something that wage and hour does, and wage and hour employees do on a regular basis. Well, but he also said at the evidentiary hearing that he's never had a case like this. So to say, well, we always do it this way, I'm not sure that cuts it when you've never had a case like this. I believe, Your Honor, that Mr. Hunt was not talking about the process of estimating representative values. I believe what he was referring to there was the fact that you had zero records in this case. You had no employer time records. You had no pay stubs. It was difficult to access the children. And you had all of these claim forms that he was processing. I think he was referring to sort of the unique situation in which he was working, but not the work that he was actually doing. Well, in that regard, at one point, pretty late in the hearing, the district court expressed concern that the department had not met its burden, especially in not following up with claimants who provided incomplete information. The court also said that she didn't think that the department had done enough. Now, at the end of the day, the district court approved the numbers, but why wasn't it unreasonable for the department not to at least follow up with some of those children who didn't even fill out information on the form? There was some follow-up. The department did follow up with some of the children. In some instances, the Wage and Hour Investigator was able to communicate with the parent of the child. In some instances, the Wage and Hour Investigator didn't hear back. The department did not try to follow up with all of the children who didn't report days per week or weeks per year for a couple of reasons. First, because that would have been very difficult to do. It would have been time-consuming, but also, as the district court found in this case, the department's ability to gain information from these children was very restricted. But secondly, courts have consistently held that you do not need individualized proof in a Mount Clemens case, and that it is perfectly acceptable to infer hours worked for some of the employees from a smaller group of the employees. In fact, in this case, the samples that the department was using to infer the hours are much larger than what you normally see. The department's investigator testified that usually we seek about 10 percent of the employees. We use their information to calculate the damages. There are cases we cited in our brief which also show that courts have approved backwage calculations under Mount Clemens using much smaller samples than the sample here. So here you had pretty large samples, and also you had pretty clear patterns in terms of the data. So it was a case that lent itself well to using the representative values. Council, you're down to a minute, and I just wanted to get your thoughts on the 2013 harvest. Why is it not enough to have rebutted the evidence in the inference that there was no contract between Paragon and the Pecan Ranch for that year? Why is that alone not enough? Well, there's also the 49 claim forms in the record where children reported working on the ranch in 2013. So the district court weighed the evidence and said that the fact that there was no contract here was not sufficient to overcome these 49 children who said they, in fact, worked at the ranch in 2013. And we're down to three seconds, but let me just ask if either panelist has additional questions, and if so, please go forward. None here. All right. Thank you very much for your argument. Your time has expired, and now we'll turn it back for the rebuttal argument with two minutes and 57 seconds left, which will hold you to it because we want to be fair on the time. Thank you, Your Honor. The fact that no records were provided is precisely why we're dealing with Mount Clemens case. That's the whole reason that that model is applicable here. Yeah. So to go back and say, but there were no records provided really only tells us now we use this different model to approach the case. It doesn't relieve... Well, isn't that one of the purposes of Mount Clemens? The employee should not be allowed to benefit from refusing or failing to keep any records at all? That's correct, and that's precisely what drove the court in Mount Clemens to create this prima facie case approach. And in Mount Clemens, the court tells us that the plaintiff must first prove that he has in fact performed the work and the amount and extent of that work. If plaintiff does that, then the burden shifts to the employer to come forward, not prove, come forward with evidence. Well, evidence can make it up to proof, can't it? Well, evidence, there are cases from the 10th Circuit that say cross-examination evidence is adequate. Well, that's still evidence. Precisely. You didn't cross-examine anybody here. Cross-examined Mr. Hunt, and as a result, we came up with a number of flaws. And some of those resulted in him actually correcting some of them after the fact, which he filed with the court subsequently. But once the employer comes forward with evidence to negate the presumptions, then if, I'm quoting directly from the Supreme Court, if the employer fails to produce such evidence, then the court may award damages to the employee. That didn't happen here. First of all, I don't think the prima facie case standard was met appropriately. But even if it was, clearly, the defendant did present evidence to rebut or negative the presumptions that arise from that prima facie case. What was the evidence? Pardon? What was the evidence? I asked you that before. The evidence is detailed in all of the briefs. Well, I want you to tell me what it was. What's the best evidence that you put on that negated the prima facie case? There were all the problems associated with Mr. Hunt's assumptions. There was the fact that the 213 work was never done by Paragon. And even those 49 claimants that said they went out to that ranch in 213, not one of them ever even suggested that they did so for Paragon. Not one of them. All the testimony... Well, it was their ranch. It was not Paragon's ranch, Your Honor. Paragon was contracted with the owner, which was, we call it super, but Southern Utah Pecan Ranch, which was a Nevada entity that owned the ranch. And also, with respect to the child labor, both the court and... If you're going off on a new argument, your time has expired. I was just going to finish responding. Very well. You want me to finish? Sure. Okay. With respect to the child labor issue for the 12 and 13-year-olds, both the court and the second part of the statute, which says that if you're working on a ranch alongside an adult who's there on behalf of the parents that you're... Well, there was no evidence of any written consent. There was no evidence that they were employed with their parents or that their parents were even employed. Well, Your Honor, my point with that was the very same legal analysis that the court adopted to hold the children as employees would apply with absolute equal emphasis. Except you need a written consent for the exemption, and it's an affirmative defense, which was not specifically pledged. The statute doesn't say written consent. The statute says if you're employed with someone who's standing in place of the parent, simply says with the consent. And counsel agreed that they had that consent. And I cited that from the transcript. And then... All right. Thank you. Okay. Thank you, Your Honor. Thank you, counsel, for your arguments. The case is submitted, and counsel are excused.